UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

JUSTIN MURPHY, GREGG LIVERMAN and
JEFFREY BUSH,

        Plaintiffs,

    -against-

CITY OF NEW YORK, NYPD OFFICER
SHAWN NIGRO, Shield No. 20998, NYPD
SERGEANT DIANA PICHARDO, Shield No.
2816, NYPD OFFICER JOVANNY
CALDERON, Shield No. 0367, NYPD
LIEUTENANT BETH PAULSON, Shield No.
02437, and NYPD JOHN/JANE DOE
OFFICERS 1-12, individually,

        Defendants.

------------------------------------------------------------- x

**FIRST AMENDED
COMPLAINT**

Jury Trial Demanded

No. 16 Civ. 519 (MKB)
(PK)

## <u>NATURE OF THE ACTION</u>

  1.  This is an action to recover money damages arising out of the

violation of Plaintiff Justin Murphy's, Gregg Liverman's and Jeffrey Bush's

("Plaintiffs") rights under the Fourth, Fifth, Sixth and Fourteenth Amendments of

the United States Constitution.

## <u>JURISDICTION AND VENUE</u>

  2.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and

the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the

United States.

3.     This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

4.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and

(c).  The incident in question took place in this District in Kings County.

## JURY DEMAND

5.     Plaintiffs demand a trial by jury in this action pursuant to Federal Rule

of Civil Procedure ("FRCP") 38.

## PARTIES

6.     At the time of the herein described incident, which took place in

Kings County, Plaintiffs were residents of Scranton, Pennsylvania and Kings

County.

7.     Defendant City of New York was and is a municipal corporation duly

organized and existing under and by virtue of the laws of the State of New York.

8.     Defendant City of New York maintains the New York City Police

Department (hereinafter "NYPD"), a duly authorized public authority and/or police

department, authorized to perform all functions of a police department as per the

applicable sections of the aforementioned municipal corporation, the City of New

York.

9.     Defendant NYPD Officer Shawn Nigro, Shield No. 20998, NYPD

Sergeant Diana Pichardo, Shield No. 2816, NYPD Officer Jovanny Calderon,

2

Shield No. 0367, NYPD Lieutenant Beth Paulson, Shield No. 02437, and NYPD

John/Jane Doe Officers 1-12 were duly sworn officers, employees and agents of

said department at all times relevant herein and were acting under the supervision

of said department and according to their official duties.  Officer Defendants are

sued in their individual capacities.

10.     That at all times hereinafter mentioned Defendants, either personally

or through their employees, were acting under color of state law and/or in

compliance with the official rules, regulations, laws, statutes, customs, usages

and/or practices of the State of New York and/or the City of New York.

11.     Each and all of the acts of the Defendants were done by said

Defendants while acting within the scope of their employment by Defendant City

of New York.

## STATEMENT OF FACTS

12.     On April 6, 2014, Plaintiffs were invited guests at a friend's party held

in the friend's apartment at 2249 Stillwell Avenue in Kings County.

13.     Plaintiffs estimate that there were eleven people in attendance at the

party, including Plaintiffs themselves.

14.     None of the Plaintiffs lived at the address.

15.     The front door to the apartment opened onto the kitchen and the living

room.

16.     Plaintiffs were with fellow partygoers in the living room at the time of the incident in question.

17.     Sometime after midnight, Defendants, including Defendant Pichardo, Defendant Nigro, Defendant Calderon and Defendant Paulson arrived at Apartment 4B.  On information and belief, Defendants were responding to a noise complaint.  Defendants' team kicked open the apartment door and, on information and belief, more than ten officers were on the scene and entered.

18.     Once Defendants entered the apartment, they immediately began to handcuff everybody in attendance.

19.     Before long, all eleven people in attendance at the party were handcuffed and laying face down in the living room, Plaintiffs included.

20.     As certain Defendants roughly pushed Plaintiff Jeffrey Bush to the floor, Plaintiff Jeffrey Bush hit his mouth on the ground, knocking loose a filling from a previously chipped front tooth.  On information and belief, Defendant Nigro was among the Defendants who used this undue force upon Plaintiff Jeffrey Bush, as Defendant Nigro effected Plaintiff Jeffrey Bush's arrest.  On information and belief, Plaintiff Liverman also suffered an injury as a consequence of rough handling, and a chemical agent was used at the apartment as well, causing Plaintiffs and other attendees to suffer ill effects.

21.    As some Doe Defendants handcuffed and forced party attendees to lie face down on the floor, other Doe Defendants searched other parts of the apartment, including the apartment's two to three bedrooms and bathroom which were located one right after another down a long hallway.

22.    Plaintiffs heard Doe Defendants kicking their way into the bedrooms where Plaintiffs had not been.

23.    Doe Officers then arrested Plaintiffs and all partygoers and took them to PSA1.  In particular, on information and belief, Defendant Nigro arrested Plaintiff Gregg Liverman and Plaintiff Justin Murphy, and Defendant Calderon arrested Plaintiff Jeffrey Bush.  On information and belief, Defendant Nigro and Defendant Calderon did this despite their lack of probable cause to believe that Plaintiffs committed an offense on Defendant Pichardo's and Defendant Paulson's direction and/or with their knowing failure to intervene.

24.    Plaintiffs and their fellow partygoers were incarcerated and taken to Central Booking the next day.

25.    At Central Booking, the partygoers were randomly divided into groups of three for the purposes of being charged with criminal offenses.

26.    Plaintiff Justin Murphy was placed on one complaint with two fellow partygoers who are not parties in this action.  Plaintiff Gregg Liverman was placed

on a second complaint with two fellow partygoers who are not parties in this action. Plaintiff Jeffrey Bush was placed on a third complaint with two fellow partygoers who are not parties in this action. On information and belief, three other partygoers who are not parties in this action were placed on a fourth complaint.

27. The three criminal complaints which corresponded to Plaintiffs and the fourth complaint against fellow partygoers all leveled identical false allegations.

28. Defendant Pichardo and Defendant Nigro, both of whom were present on the scene at Apartment 4B, knowingly made and/or allowed false statements to be submitted to the D.A. Office's staff regarding the incident knowing that the D.A. Office would rely upon the false statements in deciding whether to commence criminal proceedings against Plaintiffs.

29. For example, Defendant Nigro stated to employees of the District Attorney's Office that he recovered a firearm, ammunition, heroin and marijuana from a television stand inside one of the apartment's bedrooms and falsely and maliciously suggested that he found Plaintiffs and all partygoers who later became Plaintiffs' co-criminal defendants located within the apartment such that it was reasonable to impute possession of the contraband to them.

30. Defendant Nigro's statement was false because Plaintiffs were all in

the living room at the time Defendant Nigro, Defendant Pichardo, Defendant Calderon, Defendant Paulson and Doe Officers executed the raid upon the apartment and at all times thereafter, rooms away from the closed room where Defendant Nigro claimed to have located contraband inside the television stand.

31.     In reliance upon Defendant Nigro's false statements, which Defendant Pichardo, Defendant Paulson, Defendant Calderon and Doe Officers 1-12 failed to intervene to correct at the moment of false arrest or throughout the subsequent malicious prosecution, Plaintiffs were charged with a multitude of serious crimes and suffered deprivations of their liberty of varying degrees of severity as a result.

32.     Approximately six months later, a state court judge dismissed the charges against Plaintiffs on the motion of the prosecutor in a termination which was favorable to Plaintiffs.

33.     Plaintiffs suffered damages as a result of Defendants' actions, including deprivation of their liberty, damage to their reputations, humiliation, physical injury, emotional trauma, deprivation of a fair trial, and more.

34.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to a custom, policy and/or practice of: arresting innocent

persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

35.     The aforesaid incident is not an isolated incident.  The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts.  As a result, Defendant City of New York is aware (from said lawsuits as well as notices of claims and complaints filed with the NYPD's Internal Affairs Bureau and the CCRB) that many NYPD officers, including the Defendants, arrest individual persons in order to meet productivity goals and arrest quotas; arrest individuals for professional advancement, overtime compensation and/or other objectives outside the ends of justice; and/or falsely arrest individuals and engage in a practice of falsification of evidence in an attempt to justify the false arrest.

36.     Additional allegations relating to these unconstitutional policies, customs and practices and the failure to adequately screen, hire, retain, train and supervise are set forth in the section corresponding to Plaintiffs' <u>Monell</u> claim, below.

37.     Defendant City of New York is aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights.  Despite such notice, Defendant City of New York has failed to take corrective action.  This failure caused Individual Defendants in this case to violate Plaintiffs' constitutional rights.

38.     Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants lacked the objectivity, temperament, maturity, discretion and disposition to be employed as police officers.  Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train and supervise them.  As just one example, a review of federal dockets reveals that certain Individual Defendants have had federal civil rights lawsuits brought against them with unusual frequency and that these lawsuits often alleged misconduct similar to the misconduct alleged here.  This is to say nothing of the frequency with which the Individual Defendants

were the subjects of New York State Court civil rights complaints, CCRB complaints, IAB proceedings, or disciplinary proceedings not named here.

39. All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

40. All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

41. The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYPD, all under the supervision of ranking officers of said department.

42. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

43.    As a result of the foregoing, Plaintiffs are entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

44.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

45.    Defendants, by their conduct toward Plaintiffs alleged herein, violated Plaintiffs' rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

46.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

47.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SECOND CLAIM
## FALSE ARREST AND UNREASONABLE SEARCH

48.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

49.     Defendants violated the Fourth and Fourteenth Amendments because they arrested Plaintiffs without cause and unlawfully searched them in connection with those false arrests.  In light of the fact that Plaintiffs were not residents at the apartment, and in light of the fact that the contraband was found inside of a closed room in which Plaintiffs were not located, Defendants had no reasonable cause to believe that Plaintiffs possessed any of the contraband.

50.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

51.     In addition, and as already stated, Defendants unlawfully searched the premises of Apartment 4B without a warrant, then proceeded to search Plaintiffs' own bodies.  In light of the fact that Defendants were purportedly responding to a noise complaint yet kicked open the door to an unremarkable party, they had no grounds to search the entire premises as exhaustively as they did, particularly because they had already made all party attendees lie face down, handcuffed.  At

that point, Defendants ought to have obtained a warrant to search further.  Nor did Defendants have grounds to search all party attendees, Plaintiffs among them, for the same reason.

52.     Assuming, arguendo, that Defendants had the right to conduct pat downs of the party attendees given the reports of a gun, Defendants did not have the authority to do full-on searches of Plaintiffs' bodies for all the same reasons that Defendants did not have authority to arrest Plaintiffs and all other party attendees for contraband found inside closed rooms where Plaintiffs were not located and/or outside the building without cause to believe that Plaintiffs played any role in the contraband ending up there.

53.     Insofar as Plaintiffs were not the owners or residents of Apartment 4B, it stands to reason that they had no expectation of privacy relating to the apartment's premises but their Fourth Amendment unreasonable search claim certainly relates to the unreasonable search of their actual bodies.  However, the unreasonableness of Defendants' search of Apartment 4B is relevant to Plaintiffs' claim that most all of Defendants' conduct relating to them that night was also unlawful.

54.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## THIRD CLAIM
## MALICIOUS PROSECUTION

55.    Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

56.    Defendants violated Plaintiffs' rights under 42 U.S.C. § 1983 to be to be free from malicious prosecution under the Fourth and Fourteenth Amendments to the United States Constitution.

57.    Defendants' prosecution of Plaintiffs constituted malicious prosecution in that there was no probable cause to support Plaintiffs' arrest, yet Defendants continued with malice with the prosecution, which was resolved in Plaintiffs' favor.

58.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs' of their constitutional rights.

59.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## FOURTH CLAIM
## EXCESSIVE FORCE

60.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

61.     The Individual Defendants used excessive force upon Plaintiffs.

62.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## FABRICATION OF EVIDENCE AND DENIAL OF CONSTITUTIONAL RIGHT TO FAIR TRIAL

63.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

64.     The Individual Defendants created false evidence against Plaintiffs and Individual Defendants also forwarded it to prosecutors in the District Attorney's Office with the goal of denying Plaintiffs a fair trial by injecting fabricated evidence into the proceeding which they knew was material proof vis-à-vis the charges brought against Plaintiffs.

65.     In creating false evidence against Plaintiffs likely to influence a jury's decision, and in forwarding false evidence to prosecutors, the Individual Defendants violated Plaintiffs' constitutional right to a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

66.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

67.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## SIXTH CLAIM
## FAILURE TO INTERVENE

68.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

69.     Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

70.     Accordingly, Individual Defendants who failed to intervene violated the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

71.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiffs of their constitutional rights.

72.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

### SEVENTH CLAIM
### MONELL CLAIM

73.     Plaintiffs repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

74.     The foregoing injuries and violations of Plaintiff's federal constitutional rights were directly, foreseeably, proximately, and substantially caused by conduct chargeable to the Defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are allegedly investigated, arrested, or prosecuted for alleged criminal activities.

75.     The City is liable for the aforementioned injuries and violations because the City has failed to right the wrong in this case but, more importantly, it has created policies or customs which have created conditions and which perpetuate conditions under which unconstitutional practices regularly occur and even thrive; and has been indifferent, reckless and negligent in managing subordinates who cause the unlawful events.  The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct.

76.     The acts complained of were carried out by the Defendants in their capacities as police officers and officials pursuant to policies, procedures, regulations, practices, and customs implemented by the City and NYPD, and all under the supervision of ranking officers of the NYPD.

77.     Policymaking officials of the City and NYPD implemented plainly inadequate policies, procedures, regulations, practices, and customs, including but not limited to the following: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet "productivity goals"; 3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers'

jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and 6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.  By failing to properly train, supervise and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

78.    At the time of the aforementioned constitutional violations, the City and NYPD had long been on notice of such unconstitutional conduct, customs, and de facto policies, such that the failure of the City and NYPD to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part, infra, the need for more effective supervision and other remedial measures was patently obvious, but the City and NYPD made no meaningful attempt to prevent future constitutional violations.

79.    The City is on clear notice that its policies and customs have caused and continue to cause chronic constitutional violations.  This notice is evidenced by (1) the number of Civil Rights Lawsuits filed against it and its law enforcement officers (which, on information and belief, the City does not adequately track in

order to identify problem precincts and/or problem officers), (2) the number of
Notices of Claim ("NOC") filed against the City and its law enforcement officers
and the City's inadequate responses to those NOCs, (3) the number of Complaints
filed with the Civil Complaint Review Board ("CCRB") against the City's law
enforcement officers, (4) City Council hearings, (5) newspaper reports, (6)
criminal cases resulting in declined prosecutions and dismissals, and (7) judicial
rulings suppressing evidence and finding officers incredible as a matter of law.
Taken together, all of these red flags demonstrate that a troubling number of
NYPD officers unlawfully search and seize New Yorkers without probable cause,
bring charges against New Yorkers with no legal basis, perjure themselves in
charging instruments and through testimony, use excessive force against
individuals, and fail to intervene in and report the obviously illegal actions of their
fellow officers, inter alia.

80.     For decades, the City has been on notice that certain precincts and
certain police officers are disproportionately responsible for civil rights lawsuit
liability.  Nonetheless, the City has failed to take action to track such information
in order to hold precincts or officers accountable.  See, e.g., Wyatt v. Cole, 504
U.S. 158, 161 (1992) ("The purpose of § 1983 lawsuits is to deter state actors from
using the badge of their authority to deprive individuals of their federally
guaranteed rights and to provide relief to victims if such deterrence fails.").

81.     One of the more recent examples of the City failing to make use of Civil Rights Lawsuit data to improve law enforcement's record vis-à-vis the protection of individuals' rights occurred in 2014 when the City Council considered whether the NYPD should have to produce quarterly reports about complaints against the department.  Among other things, the reports would indicate whether an officer who was the subject of a complaint had "previously been the subject of a civil action or actions alleging police misconduct" so that tailored attention could be given to an open and obvious existing and/or developing problem.  See Azi Paybarah, Council Seeks Regular Reports On NYPD Complaints, May 5, 2014, at http://www.capitalnewyork.com/article/city-hall/2014/05/8544832/council-seeks-regular-reports-nypd-complaints (last accessed May 21, 2016).

82.     NYPD Commissioner Bill Bratton publicly opposed these reporting requirements.  In June 2015, Commissioner Bratton stated that "[r]ather than enacting a set of reporting bills that impose information-sharing as a mandate, [the NYPD and the City Council] should sit down together and work out how relevant information may be shared, taking into account the manner in which the information is collected and maintained—and our available resources."  See New York Police Department Commissioner William Bratton, Statement Before The

New York City Council Public Safety Committee, June 30, 2015, at

http://nypdnews.com/2015/06/police-commissioner-brattons-statement-before-the-new-york-city-council-public-safety-committee/ (last accessed May 21, 2016).

83.     The City's failure to compile and employ Civil Rights Lawsuit data in this manner is particularly shocking when one considers the trove of data that this represents.  For example, between 2009 and 2014, the City paid an average of $33,875 per case to resolve well over 10,000 cases.  See Caroline Bankoff, The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years, Oct. 12, 2014, available at: http://nymag.com/daily/ intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (last accessed May 26, 2016).  Similarly, the City Comptroller has reported that the City of New York's payments to resolve allegations of misconduct by members of the NYPD has risen from $99 million to $217 million in between 2005 and 2014. While such numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct.  See Office of the Comptroller, Claims Report: Fiscal Years 2013 and 2014, available at http://nylawyer.nylj.com/ adgifs/decisions15/083115claims.pdf.

84.     The City's opposition to or refusal to consider adopting more robust data collection, analysis and reporting practices, despite knowing those practices' benefits, has been longstanding.

85.     In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was a "total disconnect" between the settlement of civil claims—even substantial ones—and NYPD discipline of officers.  Hevesi continued that, as a result of this disconnect, the NYPD does not learn of potential problem officers and precincts, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation, resulting in harm to another person and further damages from the City.

86.     In March 2000, the New York City Bar Association's Committee on New York City Legal Affairs made much the same observation.  After noting the large sums of money the City paid to settlement civil rights claims filed against it and its agents, the Committee lamented the fact that "there is no showing that either the police department or the City administration has made systematic use of the facts or results in such cases either in connection with the discipline of individual police officers or in the shaping of police department policy." See The Association of the Bar of the City of New York Committee on New York City Affairs, The Failure of Civil Damages Claims to Modify Police Practices, and

Recommendations for Change, March 2000, at http://www2.nycbar.org/
Publications/reports/show_html_new.php?rid=32#Ref3 (last accessed May 21,
2016).

87.     In 2009, the City Council noted that study of a large number of cases
might well reveal patterns of misconduct against which the NYPD could and
should take systematic management action, but again, this elicited no significant
change in the City's methods.  See Christopher Dunn and Robert Perry, Reporting
By The New York City Corporation Counsel On Civil Damage Claims Related To
Police Misconduct, 2009, at http://www.nyclu.org/content/reporting-new-york-
city-corporation-counsel-civil-damage-claims-related-police-misconduct (last
accessed May 26, 2016).

88.     By failing to keep track of crucial data, which could save lives as well
as taxpayer money, the City has created a system in which lawsuits are treated as
unrelated to their potential deterrent effect.

89.     The City is also on notice that it employs policies and practices which
are presently insufficient to identify law enforcement's chronic violations of
individuals' civil rights because recent Civil Rights Lawsuits and Criminal
Prosecutions amply document systemic problems which the NYPD resists
addressing, as evidenced by its opposition to reporting protocols and officer
recidivism analyses.  By way of example,

a. In <u>Schoolcraft v. City of New York</u>, 103 F. Supp. 3d 465
(S.D.N.Y. 2015), the Court found that evidence showed an
issue of fact as to whether the City had a custom of retaliation
against whistle blowers.  Among the record evidence was
expert witness testimony about a "blue wall of silence," which
is a "police culture that prizes intense loyalty, unity and
solidarity among police officers to the extent that any officer
reporting the wrongdoing of another officer would be in
violation of the code and subject to retaliation."  In addition,
IAB-run focus groups had revealed that "physical fear surfaced
several times [in participants] during the discussion on
reporting corruption."

b. In <u>Colon v. City of New York</u>, No. 09 Civ. 0008 (JBW), 2009
WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009), the Court denied
the City's motion to dismiss the civil rights plaintiff's <u>Monell</u>
claim against it for insufficient pleading, finding that:

> Informal inquiry by the court and among the judges
> of this court, as well as knowledge of cases in other
> federal and state courts, has revealed anecdotal
> evidence of **repeated, widespread falsification by
> arresting police officers of the New York City
> Police Department**.  Despite numerous inquiries by
> commissions and strong reported efforts by the
> present administration—through selection of
> candidates for the police force stressing academic
> and other qualifications, serious training to avoid
> constitutional violations, and strong disciplinary
> action within the department—**there is some
> evidence of an attitude among officers that is
> sufficiently widespread to constitute a custom or
> policy by the city approving illegal conduct of the
> kind now charged**.

(emphasis added).  In response, NYPD Commissioner
Raymond Kelly said that when this misconduct "happens,
it's not for personal gain. It's more for convenience."  <u>See</u>
Loren Yaniv and John Marzuli, <u>Kelly Shrugs Off Judge </u>

<u>Who Slammed Cops</u>, New York Daily News, December 2, 2009, available at <u>http://www.nydailynews.com/news/ crime/police-commissioner-kelly-shrugs-judge-slammed- cops-article-1.433710</u>.

c.  In <u>People v. Arbeeny</u>, Index No. 6314-2008 (N.Y. Sup. Ct., Kings County), former undercover NYPD narcotics officer Steve Anderson testified about the frequency with which he observed a law enforcement officer planting narcotics on a suspect in order to make an arrest that would held the officer meet his or her monthly quota of arrests.  In order to achieve this, according to Anderson, an officer would carry a stash of narcotics to plant on innocent civilians, a practice that he called "attaching bodies."  According to Anderson,

> It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators.  Seeing it so much, it's almost like you have no emotion with it.  The mentality was that they attach bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway.  That kind of came to me and I accepted it – being around so long, and being an undercover.

<u>See, e.g.</u>, John Marzulli, <u>We Fabricated Drug Charges Against Innocent People To Meet Arrest Quotas, Former Detective Testifies</u>, Oct. 13, 2011, at <u>http://www.nydailynews.com/</u>crime/fabricated-drug- charges-innocent-people-meet-arrest-quotas-detective- testifies-article-1.963021 (last accessed May 26, 2016); Jim Dwyer, <u>The Drugs?  They Came From The Police</u>, Oct. 13, 2011, at <u>http://www.nytimes.com/2011/10/14/</u>nyregion/- _those-drugs-they-came-from-the-police.html?_R=0 (last accessed May 26, 2016).

In response to the testimony, the presiding judge, New York Supreme Court Justice Gustin Reichbach stated

> Having been a judge for 20 years, I thought I was not
> naïve regarding the reality of narcotics enforcement.
> But even the Court was shocked, not only by the
> seeming pervasive scope of the misconduct, but even
> more distressingly by the seeming casualness by
> which such conduct is employed.

d.  In People v. William Eiseman, Index No. 2999-2010 (N.Y. Sup.
Ct., New York County), NYPD Sergeant William Eiseman pled
guilty to perjury and falsifying police records, admitting to
faking a marijuana case against one man and cocaine-related
charges against another – and training subordinate officers to
falsify paperwork to sidestep legal safeguards.  See, e.g., NYPD
Sgt. William Eiseman Pleads Guilty To Lying Under Oath In
Plea Deal, New York Daily News, June 27, 2011, at
http://www.nydailynews.com/news/crime/nypd-sgt-william-
eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288
(last accessed May 26, 2016).

a.  In or around 2007, the United States Attorney's Office investigated
the 109th precinct of the NYPD for "planting drugs on suspects and
stealing cash during gambling raids."  The 109th precinct is believed to
be involved in a practice known as "flaking" wherein police officers
plant drugs on suspects in order to bring legitimacy to the arrest.
According to the Assistant United States Attorney Monica Evans,
members of the 109th Precinct "maintained a small stash of drugs in an
Altoids tin for this purpose."  John Marzulli, Claims of Corruption in
Kings Precinct Put Crooked Cop's Sentencing on Hold, N.Y. Daily
News, June 20, 2008, available at http://www.nydailynews.com/news/
crime/claims-corruption-Kings-precinct-put-crooked-sentencing-hold-
article-1.296352 (last accessed May 26, 2016).

e.  In late 2009, a former NYPD officer in the Bronx, Pedro
Corniel, was charged with perjury for claiming to have caught a
burglar "red-handed" when, in fact, two other officers had made
the arrest and handed the arrest off to Corniel.  In connection
with the incident, it was revealed that as many as two dozen
similar cases had come to light in the preceding year.

> That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

See Murray Weiss, NYPD In A Liar Storm, N.Y. Post, Oct. 26, 2009, at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_ qazMBEm3UNJVogv4Ndeqcl (last accessed May 26, 2016).

f.  In Bryant v. City of New York, Index No. 22011/2007 (N.Y. Sup. Ct., Kings County), a jury found that the NYPD had a policy "regarding the number of arrests officers were to make that violated [the] plaintiff's constitutional rights and contributed to her arrest."  See Oren Yaniv, Court Rules That Cops Do Use Quotas; Woman Injured In 2006 Arrest Settles For $75,000, New York Daily News, Feb. 19, 2011 (last accessed May 21, 2016).

g.  In MacNamara v. City of New York, No. 04 Civ. 7922 (RJS) (JCF) (S.D.N.Y), Docket No. 542, the Court granted the Plaintiffs' motion to approve a class-wide settlement reached in a case demonstrating evidence that police officers systematically perjured themselves in sworn statements in order to justify the unlawful mass arrests of 1,800 demonstrators during the 2004 Republican National Convention.

h.  In White-Ruiz  v. City of New York, 983 F. Supp. 365, 380 (S.D.N.Y. 1997), the Court stated that it found the Mollen Commission's July 7, 1994 report investigating "Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department" to be "entirely reliable."  Among other

things, the Mollen Commision reported that NYPD "[o]fficers who report misconduct are ostracized and harassed; become targets of complaints and even physical threats; and are made to fear that they will be left alone on the streets in a time of crisis. This draconian enforcement of the code of silence fuels corruption because it makes corrupt cops feel protected an invulnerable."

i.   In <u>Ariza  v. City of New York</u>, No. 93 Civ. 5287 (CPS), 1996 WL 118535, at *6 (E.D.N.Y. Mar. 7, 1996), the Court denied the defendants' summary judgment motion on the question of whether the City had a custom of retaliation against police corruption whistle blowers, stating that a reasonable jury could plausibly find that the plaintiff's evidence "establishes both a widespread usage and a failure to train in the police department."

90.    These cases are but a small drop in the ocean of Civil Rights Cases and Criminal Prosecutions which tend to reveal that the NYPD has been shown over and over to have a culture of unconstitutional customs and practices, **specifically with regard to the a culture of officers lying under oath, falsely swearing out criminal complaints or otherwise falsifying or fabricating evidence, and covering for one's colleagues when they engage in this misconduct**, results in individuals suffering false arrest, false imprisonment, malicious prosecution, and other constitutional torts.

91.    It is thus manifestly clear through the litigation brought in federal and state courts in the City that even if the City was not the deliberate, malicious architect of polices and routinized conduct causing chronic violations of

individuals' constitutional rights, it was certainly on notice of the practice. By failing to take any meaningful corrective steps and instead choosing to put out fires whenever they break out (which is often), the City has ratified, endorsed, and otherwise communicated its acceptance of these policies and customs to the officers it employs.

92.     In addition, members of the NYPD are evaluated, at least in part, on the basis of their "productivity," which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the NYPD routinely make arrests and engage in other police activity without legal cause in order to raise their levels of "productivity" and improve the perception of their job performance.

93.     Under this policy or plan, officers are encouraged and pressured to make as many arrests as possible, which has caused and will continue to cause its officers, including the individual Defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges. Accordingly, officers would have strong incentives to fabricate claims that the persons being arrested were engaging in criminal activity. Certain examples of this were already discussed above in the context of, for example, flaking (planting narcotics on an individual in order to arrest).

94.     The existence of "productivity goals," which create incentives for

NYPD members to engage in misconduct, is demonstrated by the following:

a.  Deputy Commissioner Paul J. Browne has repeatedly admitted that
    NYPD commanders are permitted to set "productivity goals."[1]

b.  An NYPD transit lieutenant was captured on tape telling officers to
    make more arrests to meet a captain's order and do more work if they
    want overtime assignments. "All they care about is ... summonses and
    arrests and 250s," Lt. Janice Williams said, using police jargon for the
    NYPD Stop, Question and Frisk reports. She added, "The bottom line
    is everybody's individual activity is being looked at." Later in the
    recording made during a roll call in 2010 at Transit District 34 in
    Coney Island - she said only officers with "good productivity" will get
    the opportunity to work overtime. She also said Capt. James Sheerin
    wanted every officer to make at least one arrest per month - up from
    the previous order of one every three months - because crime had
    spiked and arrest totals were lower than other transit districts. "He
    wants everyone to get in the mindset that there's no more collar a
    quarter," Williams said.[2]

c.  NYPD Officer Adil Polanco has asserted that his command, the 41st
    Precinct, regularly requires officers to make at least "one arrest and
    twenty summonses" per month. Officer Polanco's allegations were
    confirmed by an audiotape obtained by the media. The contents of the
    tape reveal that these quotas are enforced through coercion and threats

---

[1] Jim Hoffer, <u>NYPD Officer Claims Pressure To Make Arrests</u>, WABC TV
Eyewitness News, March 2, 2010, available at <u>http://abclocal.go.com/wabc/
story?section=news/investigators&id=7305356</u> ("Police Officers like others who
receive compensation are provided productivity goals and they are expected to
work").

[2] Rocco Parascandola, <u>NYPD Lt. Janice Williams Captured On Tape Pushing For
More Busts But Brass Says There's No Quotas</u>, N.Y. Daily News, March 3, 2011.

of job loss; <u>to wit</u>, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing.  You're going to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing till (sic) then."[3]

d.  The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct.  The memos specifically instructed officers about the "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" that they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[4]

e.  Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[5]

---

[3] See Hoffer, <u>supra</u>.

[4] James Fanelli, <u>Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say</u>, N.Y. Daily News, Nov. 8, 2010, available at <u>http://www.nydailynews.com/new-york/cops-brooklyn-crime-ridden-77th-precinct-told-meet-quotas-moving-violations-memos-article-1.452621</u>.

[5] Tom Namako, <u>Nighttime Riders in Big Sit Fit</u>, N.Y. Post. Dec. 26, 2009, available at <u>http://nypost.com/2009/12/26/nighttime-riders-in-big-sit-fit/</u>.

f.  In December of 2010 and in response to the pressure from their supervisors to issue baseless summonses pursuant to the policy and practice of quotas, police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[6]

---

[6] Rocco Parascandola, Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas, N.Y. Daily News, Dec. 12, 2010, available at http://www.nydailynews.com/news/crime/irate-cops-79th-precinct-bedford-stuyvesant-threaten-boycott-quotas-article-1.474648.

g. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violation citations; three "quality-of-life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice. New York City Ticket Quota Confirmed, Denied, The Newspaper.Com, January 21, 2006, available at http://www.thenewspaper.com/news/09/914.asp.

h. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News. Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by the 911 dispatcher.

See Allison Gendar, NYPD captain allegedly caught in arrest quota fixing, The New York Daily News, November 14, 2007, available at

34

http://www.nydailynews.com/news/crime/nypd-captain-allegedly-caught-arrest-quota-fixing-article-1.256006.

95. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct, and discipline police officers; encouraging their misconduct; and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact** are further evidenced, *inter alia*, by the following:

a. In Floyd v. City of New York, 2013 WL 4046209 (S.D.N.Y. Aug. 12, 2013), the plaintiffs brought a § 1983 action alleging that their Fourth and Fourteenth Amendment Rights were violated when they were stopped pursuant to New York City's stop and frisk policy. The court cited a 1999 investigation by the Attorney General finding that NYPD officers were conducting "unjustified stops and frisks" as evidence of the NYPD's awareness of its widespread violation of constitutional rights.[7] Despite this notice, the NYPD actually "[increased] its stop activity by roughly 700%" between 2002 and 2011 by "pressuring commanders … [who], in turn, pressured mid-level managers and line officers to increase stop activity by rewarding high stoppers and denigrating or punishing those with lower numbers of stops."[8] **In addition to noting several inadequacies in the NYPD training materials, the court found that "[t]he gravest problems in the NYPD's stop and frisk practices stem from … the 'operational policy' carried out in the streets" wherein evidence of unconstitutional stops is denied as inaccurate and offending officers are not meaningfully disciplined or monitored to**

---

[7] Floyd, 2013 WL 4046209, at *24. See also The New York City Police Department's Stop & Frisk Practices (1999) (available at http://128.121.13.244/awweb/main.jsp?flag=browse&smd=1&awdid=1).

[8] Floyd, 2013 WL 4046209, at *24, 26.

**prevent future misconduct.**[9] Indeed, the NYPD was found to be unable to correct unconstitutional practices or even identify constitutional violations.[10] Ultimately, the court found that the NYPD "violated § 1983 through their deliberate indifference to unconstitutional stops, frisks, and searches" and that "such stops [established] Monell liability based on 'practices so persistent and widespread as to practically have the force of law.'"[11]

b.   With respect to Fourth Amendment violations, in <u>Ligon v. City of New York</u>, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[12] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.  Justice Scheindlin further found that "the evidence of numerous unlawful stops at the hearing strengthens the conclusion that the NYPD's inaccurate training has taught officers the following lessons: stop and question first, develop reasonable suspicion later."[13]

c.   The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become

---

[9] <u>Id</u>. at *40, 43 (emphasis added).

[10] <u>Id</u>. at *40.

[11] <u>Id</u>. at *70-71.

[12] <u>Id</u>. at *34.

[13] <u>Id</u>. at 131.

more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[14]

d. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

e. In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 IAB investigations, and

---

[14] Mollen Commission Report, pp. 2-3, available at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

was the subject of at least 30 complaints filed with the CCRB. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to IAB charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.[15]

f.  Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the CCRB is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[16]  Since 2005, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in

---

[15] Rocco Parascandola et al, Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and his Team Have Cost the City More Than $1.5 Million in Settlements, N.Y. Daily News, May 19, 2013, available at http://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.

[16] In 2006, out of more than 10.000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%).  See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.   Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[17]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007.  Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[18]

96.     Rather than take meaningful steps to reduce and eliminate misconduct by its officers, the City and NYPD have instead affirmatively announced a renewed commitment to defending such misconduct. In an article in the New York Times, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court." According to this article, these steps were warmly received by police union leaders. The City's stated response to the wave of litigation caused by misconduct on the part of the NYPD is thus directed not at the deliberate and frequent constitutional violations underlying the consequential litigation, but rather at defending such misconduct so that

[17] Christine Hauser, Few Results for Reports of Police Misconduct, New York Times, October 5, 2009 at A19.


[18] Christopher Dunn & Donna Lieberman, City Leaders Must Get Serious About Policing the Police, Daily News, August 20, 2008.

officers can continue to engage in unconstitutional conduct without fear of being sued or held accountable. In so doing, the City has dispensed altogether with any pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by the City and NYPD's executive leaders and supervisory personnel.

97.     The City is liable to Plaintiff for its failure to keep track of judicial decisions in suppression hearings.  Suppression hearings are a common context in which police officers' reveal themselves to have fabricated testimony, and this provides a ripe opportunity for the collection of data that would permit the City to target problem officers and precincts for discipline and training.

98.     There are hundreds of published decisions from the past several years in which judges in New York City courtrooms determine that, as a matter of law, police officers have testified incredibly, conducted illegal searches and seizures, and even suborned perjury.

99.     Judicial decisions from suppression hearings and trials are particularly reliable indicators of a police officer's professional conduct and credibility because the testimony has been tested in open court, under oath.

100.   Yet those in a position of authority—such as City policymakers, NYPD supervisors and prosecutors—have devised no procedure by which an

adverse judicial finding as to an individual officer's testimony is communicated to

that officer, his/her supervisor, or an oversight body.

101.   Without any notification, improper search and seizure practices and

incredible testimony go uncorrected, problematic supervision or leadership at the

precinct level goes ignored, and repeated misconduct by individual officers goes

unaccounted for.

102.   This has created a climate where police officers and detectives lie to

prosecutors and in police paperwork and charging instruments, and testify falsely,

with no fear of reprisal.

103.   The City is also liable in this case because, by habitually indemnifying

police officers who have acted unconstitutionally, the City isolates such officers

from any sense that they might ever be held accountable for the misconduct they

commit.[19]   The effect—yet again—is that civil rights lawsuits do not serve a

deterrent purpose.  "It is almost axiomatic that the threat of damages has a

---

[19] See Eric Jaffe, When Cops Violate Civil Rights, It's City Taxpayers Who Pay,
CITYLAB, Dec. 4, 2014, at http://www.citylab.com/crime/2014/12/when-cops-
violate-civil-rights-its-city-taxpayers-who-pay/383419/ (last accessed May 21,
2016).

deterrent effect, surely particularly so when the individual official faces personal financial liability." Carlson v. Green, 446 U.S. 14, 21 (1980).

104.   The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished.  The City has purported to attempt to address police officers' abuse of authority, in part through the creation and operation of the CCRB, a police oversight agency with investigative powers.

105.   However, the CCRB has proved inadequate.

106.   First, the CCRB's very structure belies its supposed goal of holding police officers accountable for their misconduct because it often finds that a complainant "lacks credibility" based on the fact that the complainant has also brought a civil rights lawsuit.  The result is that the CCRB often fails to substantiate some of the most serious allegations.

107.   Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those dishonest officers.  The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

108.   Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its officers.  Even when the CCRB substantiates

complaints, the police department rarely imparts its own discipline on the officer, and often simply drops the complaints.[20]

109.   Fourth, the NYPD Department Advocate, endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized.  In the rare event that the CCRB substantiates a complaint and the NYPD Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner has employed.

110.   The complaint procedure provides seemingly countless opportunities for City agencies to dismiss or disregard legitimate, credible complaints.

111.   Due to the failures of the CCRB, many abuses of authority by police officers go unreported.  Officers are thus free to abuse their authority with little or no fear of repercussions.

---

[20] See Nathan Tempey, CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force, www.gothamist.com, July 28,  2015 at http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 102 officers in that same period, only 22 of which faced administrative charges) (last accessed May 21, 2016); Police Punishment: CCRB v. NYPD, www.project.wnyc.org/ccrb/ (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

112.    Here, the lack of accountability contributed to the defendant police officers' actions described herein in that the Defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiff.

113.    The actions of Defendants, resulting from and taken pursuant to the above-mentioned de facto policies and/or well-settled and widespread customs and practices of the City, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and the NYPD Commissioner who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the IAB, and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers  for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

114.   All of the foregoing acts by defendants deprived Plaintiff of his federally protected rights, including, but limited to, the constitutional rights enumerated herein.

115.   Defendant City knew or should have known that the acts alleged herein would deprive Plaintiff of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

116.   Defendant City is directly liable and responsible for the acts of Defendants, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

117.   Despite knowledge of such unlawful de facto policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including the NYPD Commissioner, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or

reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

118.   The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, Defendants felt empowered to arrest Plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Plaintiff's constitutional rights. Pursuant to the aforementioned City policies, practices and/or customs, the officers failed to intervene in or report Defendants' violations of Plaintiff's rights.

119.   Plaintiff's injuries were a direct and proximate result of the Defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the Defendant City and the NYPD to properly supervise, train and discipline their police officers.

120.   As a result of the foregoing, Plaintiff was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

121.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

122.   The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiffs' rights as described herein.  As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

123.   The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in

a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

124.   The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYPD constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

125.   The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as described herein.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiffs respectfully request the following relief:

A. An order entering judgment for Plaintiffs against Defendants on each of their claims for relief;

B. Awards to Plaintiffs for compensatory damages against all Defendants, jointly and severally, for their violation of the Fourth, Fifth, Sixth and Fourteenth Amendment rights of Plaintiffs, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

C. Awards to Plaintiffs of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional

rights and welfare of Plaintiffs, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

       D. Awards to Plaintiffs of the costs of this action, including reasonable attorneys' fees;

       E. Such further relief as this Court deems just and proper.

DATED:     August 5, 2016
            New York, New York

                        _____/s_____

                        Ryan Lozar
                        305 Broadway, 10th Floor
                        New York, New York 10007
                        (310) 867-1562
                        ryanlozar@gmail.com

                        *Attorney for Plaintiffs*